In re James Stephen HUNTER, Debtor.

Citizens First National Bank, Plaintiff,

v.

James Stephen Hunter, Defendant.

Bankruptcy No. 97–00585–3P7.
Adversary No. 98–88.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Feb. 1, 1999.

Aaron R. Cohen, Jacksonville, FL.

Albert H. Mickler, Jacksonville, FL.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This proceeding is before the Court upon the complaint of CITIZEN FIRST NATIONAL BANK ("Plaintiff") objecting to JAMES STEPHEN HUNTER'S ("Defendant") discharge in its entirety pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4). The complaint also sought to determine the dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(A), (B) and (a)(6). A trial was conducted on September 29 and October 14, 1998. After considering the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Prior to June 1991, Defendant managed two corporate business entities, to-wit Steve's Electronics, Inc. ("Steve's") and Certified Aviation, Inc. ("Certified"). Certified bought, refurbished and subsequently sold small aircraft for profit. (Tr. at 157.)

2. Defendant would oversee the repainting, engine restoration and interior reconstruction of each airplane. Defendant did most of his work with Certified outside the office. (Tr. at 214.)

3. Both of the corporations had extensive business dealings with Plaintiff.

4. Certified had an ongoing financing relationship with Plaintiff, including a $350,000.00 line of credit. Under the line of credit, Plaintiff would receive a lien on each airplane purchased by Certified. After the airplane was refurbished and resold, Plaintiff would subsequently release its lien. In the

normal course of lien transactions between Plaintiff and Certified, the proceeds from the sale of each airplane were deposited with Plaintiff in Certified's account. Plaintiff would then debit Certified's account for the lien amount and issue a lien release on that particular airplane. (Tr. at 40, 159–60.) The acquisition of planes by Certified and financing of those planes by Plaintiff was an ongoing process. (Tr. at 40.) Defendant also kept a $100,-000.00 certificate of deposit with Plaintiff through January of 1994. (Tr. at 169, Pl.'s Ex. 5.)

5. Certified was required to carry insurance coverage on each financed airplane. Plaintiff's representatives followed the routine practice of contacting Certified's office staff to request that certain airplanes be placed under the insurance policy. Certified would then call their insurance carrier and add these airplanes to the insurance policy. (Tr. at 215, 217.) Defendant testified that he did not participate directly with insurance coverage of financed airplanes or with the general office administration at Certified. (Tr. at 214, 217.)

6. Often, the aircraft were not sold within the time period contained in the initial financing arrangement of each aircraft. However, Plaintiff and Certified evolved a process in which the initial ninety day loans would be renewed for an additional ninety day period or until the collateral was sold. (Tr. at 46.) The renewal procedure often involved Plaintiff contacting Defendant and requesting him to go to the bank to execute several pre-prepared refinance agreements and notes, as well issue a certified check for any accumulated interest that had accrued on the notes/security agreements that were being refinanced. (Tr. at 169, Pl.'s Ex. 5.)

7. The subject matter of this proceeding involves a series of three loans made to Certified and Steve's. The first loan was for approximately $68,000.00 to Certified secured by a 1972 Cessna aircraft. The second loan was also to Certified for approximately $28,500.00 secured by a 1961 Cessna airplane. The third loan was unsecured for $21,-000.00 and owed to Steve's.

8. In July 1991, Certified made an arrangement with Plaintiff for the sale of the 1961 Cessna aircraft. Plaintiff agreed to a sale price of $22,500, which was to be deposited into Certified's bank account maintained with Plaintiff. Of the $22,500.00 sale price, $20,000.00 was to be applied against the $28,-500.00 loan balance with the $8,000.00 deficiency to be rolled into other notes.

9. The 1961 Cessna was sold, and Defendant delivered the $22,500.00 sale proceeds to Plaintiff in the form of a check endorsed to Plaintiff. (Tr. at 34, 39; Def.'s Ex. 3.) Plaintiff issued a release of lien and prepared an advice of debit to charge Certified's account. (Tr. at 37; Pl.'s Ex. 8; Def.'s Ex. 2.) Through Plaintiff's inadvertence, the debit was never processed and the money was never removed from Certified's account. However, Defendant received the advice of debit that indicated that Plaintiff had debited the Certified account. (Tr. at 166–67.)

10. From June 1991 through June 1994, several notable occurrences transpired. First, Defendant renewed the $28,500.00 note twelve times before Plaintiff ultimately discovered that it had failed to debit Certified's account. (Tr. at 62–63.) Second, on February 9, 1994, Plaintiff requested an updated appraisal on the 1961 Cessna (Pl.'s Ex. 11.) which was ultimately telefaxed by Certified to Plaintiff. (Pl.'s Ex. 12.) Third, on at least three separate occasions, Certified sent confirmation of insurance to Plaintiff on the 1961 Cessna after it had been sold. (Pl.'s Composite Ex. 10.) Fourth, Defendant furnished two personal financial statements to Plaintiff dated April 10, 1991 and February 17, 1994. The financial statements showed higher values for Defendant's Interlachen and Miami real estate than what Defendant actually received from the sales, and Defendant failed to disclose joint

ownership on Defendant's Miami real estate. (Pl.'s Exs. 15, 16.) The financial statements also showed an inflated price for Debtor's homestead property. Defendant attributes the distressed values of the properties to Hurricane Hugo and other environmental problems.

11. Plaintiff went through a managerial change in 1994 and upon inspection of Certified's files, determined that the 1961 Cessna had been sold three years earlier. Defendant subsequently found a buyer and sold the 1972 Cessna for $60,000.00 with Plaintiff agreeing to release the lien and roll the $8,000.00 deficiency into another note. (Tr. at 45.) Consequently, Plaintiff attempted to negotiate with Defendant to obtain additional collateral to secure the payment of the previous loan securing the 1961 Cessna, the deficiency from the sale of the 1972 Cessna and the unsecured loan in favor of Steve's. However, Defendant had sold the Miami property in 1995 when the taxes were $30,000.00 in arrears. (Tr. at 203.) Defendant sold some of the Interlachen properties from 1994 through 1998 at distressed prices due to changing environmental conditions. The proceeds from the sale of the Interlachen lots were used to fund Defendant's business enterprises. Defendant declined to collateralize the loans with his homestead property.

12. Plaintiff contends that it relied on these allegedly material false and fraudulent statements in extending credit to Certified in regard to the 1972 Cessna. In February 1997, Plaintiff brought suit in Circuit Court to collect damages.

13. In June 1997, Steve's, which continuously lost money, sold all of its assets in order to pay current vendors and transfer the liability for an automobile loan. (Tr. at 199.) Defendant never directly received any cash from the sale of Steve's.

14. On January 16, 1998, Defendant and Hunter Ventures, Inc. sold a 1994 Stamus fishing boat for approximately $38,900.00. In March 1994, Defendant had purchased the boat under his name personally, with funds contributed from his father, son and himself, for the approximate price of $80,000.00. (Tr. at 122.) However, in 1995, Defendant formed the corporate entity Hunter Ventures, Inc. and transferred the boat to the corporation for liability purposes. (Tr. at 182–85.) Stock ownership in Hunter Ventures, Inc. was equally divided between Defendant, his father, and his son. (Tr. at 183.) The only reason Defendant listed his name on the title of the boat was to reduce the price of insurance coverage. (Tr. at 185.) Defendant did not list Hunter Ventures, Inc. as a business corporation because he did not believe it to be a "business" as the boat was only used as a pleasure cruiser. (Tr. at 182, 188.)

15. Approximately $13,422.08 of the proceeds from the sale of the boat was retained by Barnett Bank to satisfy a lien it had on the boat. Defendant received $8,477.92 and the other two corporate shareholders received $8,500.00 each. (Tr. at 127.) On January 20, 1998, six days before filing his bankruptcy petition, Defendant deposited his portion of the boat sale proceeds into his Barnett Bank account. Two days later Defendant withdrew $8,662.93.00 from Barnett Bank and closed the account. (Pl.'s Ex. 23; Tr. at 136.)

16. Following the receipt of the monies, Defendant made the following payments:

| | |
|---|---|
| $1,705.18 | Pre-payment of mortgage |
| $1,940.00 | Pre-payment to dentist to fix broken crowns |
| $1,803.82 | Real estate taxes on homestead property |
| $1,100.00 | Payment of state court attorney fees in order to obtain file |
| $ 700.00 | Bankruptcy attorney |
| $ 210.00 | Light bill |
| $ 183.00 | Health insurance |
| $ 81.00 | Wife's car insurance |
| $ 413.00 | Palatka Marine |
| $ 500.00 | Deposit Credit Union account |

$8,636.00    Total[1]

17. Defendant signed his bankruptcy petition on Friday, January 23, 1998. (Pl.'s Ex. 28; Tr. at 200.) After Defendant signed the petition (which was ultimately filed on January 26, 1998 at 1:45 P.M.) he traveled to Biloxi, Mississippi to gamble. Defendant had approximately $320.00 with him (Tr. at 200–01) which he eventually lost.

18. On April 27, 1998, Plaintiff commenced this adversary proceeding against Defendant to object to Defendant's discharge pursuant to 11 U.S.C. § 727(a) et seq. and to determine dischargeability of debt pursuant to 11 U.S.C. § 523(a)(2) and (a)(6). (Doc. 1.) Defendant filed an Answer and Counterclaim to Plaintiff's Adversary Complaint on May 19, 1998. (Doc. 4.)

## CONCLUSIONS OF LAW

### 1. Objection to Discharge

■ The Court will first address Plaintiff's Objection to Defendant's discharge pursuant to 11 U.S.C. § 727, which provides in relevant part:

(a) The Court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;...

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act;...

11 U.S.C. § 727(a)(2), (4) (1998). The Bankruptcy Code favors discharge of an honest debtor's debts. *Siegel v. Weldon (In re Weldon)*, 184 B.R. 710, 712 (Bankr.D.S.C.1995). Provisions denying discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. *Id.*

■ Federal Rule of Bankruptcy Procedure 4005 provides that the initial burden of proof on an objection to discharge lies with the plaintiff. Fed.R.Bankr.P. 4005. However, it is firmly established that once the plaintiff has met the initial burden by producing evidence that establishes a basis for the objection, the debtor has the ultimate burden of persuasion. *See Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *Manhattan Leasing Systems, Inc. v. Goblick (In re Goblick)*, 93 B.R. 771, 775 (Bankr.M.D.Fla.1988).

### 11 U.S.C. § 727(a)(2)(A) and (a)(4)

■ As this Court has previously held, Bankruptcy Code § 727(a)(2)(A) requires the objecting party to show that: (1) a transfer occurred; (2) the property transferred was property of the debtor; (3) the transfer was within one year of the petition; and (4) at the time of the transfer, the debtor possessed the requisite intent to hinder, delay or defraud a creditor. *Barthlow v. More (In re More)*, 138 B.R. 102, 104 (Bankr.M.D.Fla.1992). The plaintiff must prove these four elements by the preponderance of the evidence. *See Williamson Const., Inc., v. Ross (In re Ross)*, 217 B.R. 319, 323 (Bankr.M.D.Fla. 1998).

■ The Court has further held that to prevail under 11 U.S.C. § 727(a)(2)(A), the objecting party must prove "actual intent to hinder, delay, or defraud creditors rather than constructive intent." *Commercial Nat'l Bank of Peoria v. Kindorf (In re Kindorf)*, 105 B.R. 685, 689 (Bankr.M.D.Fla.1989). In

---

1. Originally, Debtor testified at his deposition that he had not spent all of the money from the sale of the boat. However, when he went back and reviewed his expenditures he discovered that he had forgotten to include the dental bill as an expenditure. (Tr. at 140; Def.'s Ex. 17.)

order to find fraudulent intent, the Court can consider circumstantial evidence or can infer it from the totality of the circumstances. *Id.; Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 121 (M.D.Fla.1991). This Court has previously identified certain "badges of fraud" which are indicative of fraudulent intent. *Wade v. Wade (In re Wade)*, 189 B.R. 522, 525 (Bankr.M.D.Fla.1995). These "badges of fraud" include: (1) the lack or adequacy of consideration; (2) the family, friendship or close association between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt after onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *Id.*

Plaintiff alleges that Defendant failed to disclose numerous transfers he made within one year prior to filing his bankruptcy petition and that the transfers that were disclosed were made with the intent to hinder, delay or defraud creditors. Plaintiff contends that Defendant, within one year of the petition date, transferred approximately $8,500.00 each to his father and son from the sale of Defendant's boat, and also failed to disclose these transfers on his Schedules or Statement of Affairs. Plaintiff also argues that Defendant's payment to his state court attorney and dentist, pre-payment of his mortgage on his homestead, and losses attributed to gambling all within a week of the bankruptcy petition strengthens Plaintiff's argument that Defendant acted with the requisite intent to hinder, delay or defraud his creditors. Defendant asserts that these were legitimate payments to creditors. Also, Defendant contends the payments to his father and son were justified, as they were two of the three corporate shareholders whom had originally made cash contributions toward the purchase of the Hunter Ventures, Inc. boat. Moreover, Defendant claims the sale of Steve's assets was done in order to pay its creditors.

■ The Plaintiff has established by a preponderance of the evidence that the Defendant did transfer certain property. However, the Plaintiff has failed to establish by a preponderance of the evidence that these transfer were done with the intent to hinder, delay, or defraud creditors. Defendant has convinced the Court that the proceeds from the sale of Steve's assets were used to pay creditors of the corporation and were not done because of a pending lawsuit. While the sale of these assets were made to his son, one of the "badges of fraud," in consideration for the transfer of property, Defendant received much needed relief from creditors and continuing debt from a failing business. Defendant also accounted for all of the money received as an equity stockholder from the sale of the Hunter Ventures, Inc. boat. Defendant has testified that the sale of the Miami property at a distressed price was attributable to changing property and neighborhood conditions. Defendant has also convinced the Court the sale of the Interlachen lots were made well in advance of one year prior to filing his petition, the proceeds of which were used to fund his other business.

The Court finds that Plaintiff has not presented sufficient actual or circumstantial evidence necessary to establish that Defendant sought to intentionally deceive his creditors. The Court believes the Defendant's testimony and the events concerning the transfer of his property. Defendant made legitimate business decisions and sought to repay debts and pre-pay for future services. Thus, the Court concludes that Plaintiff's objection to Defendant's discharge pursuant to 11 U.S.C. § 727(a)(2)(A) is not well taken and must be overruled.

■ Plaintiff also alleges that Defendant's discharge should be denied because he made a false oath or account in connection with his bankruptcy case. Section 727(a)(4) provides four grounds to deny a debtor's discharge. 11 U.S.C. § 727(a)(4) (1998). This Court has held that a debtor's discharge should be denied on these grounds if the debtor knowingly made a false oath that was both fraudulent and material. *Mahon v. Milam (In re Milam)*, 172 B.R. 371, 375 (Bankr. M.D.Fla.1994). In order to be fraudulent,

the oath must have been made with a knowing intent to defraud creditors. *Swicegood v. Ginn,* 924 F.2d 230, 232 (11th Cir.1991). Although a single omission is generally insufficient to deny a discharge, fraudulent intent may be inferred from circumstantial evidence, including a series or pattern of omissions or errors. *Id.* A false oath may be considered material, "if it bears relationship to the debtor's business transactions or his estate." *In re Milam,* 172 B.R. at 375.

Plaintiff alleges that the Defendant's Statement of Affairs and Schedules and his testimony reflect the following inconsistencies:

1. Defendant's Statement of Affairs and Schedules indicated that he "sold boat," but did not disclose the proceed amounts transferred to his son and father, or his various creditors. Defendant testified at his deposition that the proceeds were used to pay past and future creditors. He also testified at trial that he had forgotten about pre-paying his dental bill due to the long day at the deposition.

2. Defendant's Statement of Affairs failed to disclose his corporate interest in Hunter Ventures, Inc. Defendant testified that he did not list this as a corporate interest because he did not consider it a corporation because its sole asset was a pleasure boat and was incorporated only for liability purposes.

3. Defendant's Statement of Affairs failed to disclose his interest in Steve's or that he sold all the assets to his son. Defendant indicated that there were no assets in Steve's and the corporation had been dissolved due to nonrenewal. He further listed Steve's as a corporate entity in his Schedule B and as a codefendant in lawsuit in his Statement of Financial Affairs.

4. The Defendant's Statement of Affairs failed to disclose the gambling losses suffered the weekend before he filed for bankruptcy. However, the Defendant claims he signed the petition before he had traveled to Biloxi to gamble, and therefore his Schedules were

correct on the date he signed his petition.

■■■ Although the Plaintiff has cited multiple omissions or inconsistencies in the Defendant's paperwork and testimony, the Court finds that the Plaintiff has failed to prove these errors create a series of omissions that are indicative of fraud. Defendant did not attempt to hide these assets or transfers, rather he admitted having these interests when he had the opportunity to do so. From the evidence presented, it appears the Defendant's omissions were the result of and abundance of confusion and misunderstanding, rather than an attempt to defraud a creditor. Therefore, because the evidence indicates no fraudulent intent on the part of Defendant, the Court finds that Plaintiff's objection to discharge pursuant to 11 U.S.C. § 727(a)(4) must be overruled.

**2. Exception to Discharge**

Having overruled Plaintiff's objections to Defendant's discharge, the Court must now determine whether the actions of Defendant render the debt allegedly owed to Plaintiff excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (B) and (a)(6).

*11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides, in relevant part that:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders financial condition;

11 U.S.C. § 523(a)(2)(A) (1998).

■■■ In order to prevail under 11 U.S.C. § 523(a)(2)(A), the Plaintiff must establish that: (1) the debtor made a false representation with the purpose and intention of deceiving the creditor; (2) the creditor relied on the debtor's representation; (3) the creditor's reliance on the false statement was justifi-

ably founded; and (4) the creditor was damaged as a result of the false statement. *In re Thomas*, 217 B.R. 650, 653 (Bankr.M.D.Fla. 1998). The Plaintiff bears the burden of proving these four elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ Plaintiff alleges that it continued to loan money to Defendant based on his representations that the 1961 Cessna airplane had not been sold, his continued payment of interest on the loan secured by the plane, and his procurement of insurance and appraisals on the aircraft after it had been sold. Plaintiff contends Defendant did this with the intent to deceive Plaintiff into believing it had collateral for the loan while he converted the proceeds from the sale for his own use. However, the Court finds that Plaintiff's evidence is insufficient to meet the requirements of § 523(a)(2)(A).

The Defendant did exactly what the Plaintiff had instructed him to do with regard to payment of the loan secured by the 1961 Cessna. Defendant sold the plane, deposited the proceeds into the account and received a debit slip indicating that $20,000.00 had been charged against his account. The Plaintiff never told Defendant that it had failed to debit his account or that the release of lien was issued in error. The evidence indicates that Plaintiff ordered the loan renewals, proof of insurance and appraisals. The evidence further shows that Defendant's office manager routinely processed these orders while relying on the Plaintiff representative's request and without consulting with Defendant. Further, the loan renewals were prepared by a Plaintiff representative and Defendant was often asked to sign several at a time. In fact, the same representative of Plaintiff that ordered the appraisals, proof of insurance and loan renewal was the same representative who issued the lien release and advice of debit. Moreover, the Defendant was a long-standing customer of Plaintiff and owned several aircraft that he routinely pledged as security for Plaintiff's loans. In fact, Defendant had six pending sales on aircraft securing Plaintiff's loans at the time Defendant sold the 1961 Cessna.

The Court finds that the Plaintiff's evidence is insufficient to show that Defendant made a false misrepresentation with the intent to deceive the Plaintiff. Further, the Court finds that the Plaintiff's reliance was not justifiable. Plaintiff's own faulty handling of its loan account caused it to continue to willingly loan money to the Defendant.

### 11 U.S.C. § 523(a)(2)(B)

■ The Plaintiff next alleges that the two financial statements that Defendant prepared were fraudulent and induced it to continue to extend credit to Defendant. Under section 523(a)(2)(B), Plaintiff must prove that the Defendant provided a written statement:

(i) that is materially false;

(ii) respecting the debtor's or an insiders financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor cause to be made or published with the intent to deceive;

. . .

11 U.S.C. § 523(a)(2)(B) (1998). If the Plaintiff fails to prove each of the four elements, the debt is dischargeable. *In re Mowji*, 224 B.R. 221, 225–27 (Bankr.M.D.Fla.1998).

■ The Plaintiff has failed to set forth evidence that the financial statements submitted were false at the time Defendant signed them. The Defendant testified that the value of his various properties decreased in value due to changing environmental and neighborhood conditions. Further, the Plaintiff did not reasonably rely on the financial statements submitted by Defendant as individual aircraft separately collateralized each loan. Therefore, the Plaintiff placed its reliance and hope for repayment on the collateralized loan on each individual aircraft. In fact, Plaintiff's President admitted that Defendant could have legitimately sold the real properties at any time. Moreover, Plaintiff has failed to establish that Defendant's representations in the financial statements were made with the requisite intent to deceive. The real property values used by Defendant in the financial statements were based on property appraisals done at the

request of the Plaintiff. Additionally, the evidence indicates that Defendant's real properties lost value over time and were subsequently sold at distressed prices some time after execution of the financial statements.

### 11 U.S.C. § 523(a)(6)

Finally, Plaintiff alleges that the debt owed to it by Defendant should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6). Section 523(a)(6) provides, in relevant part, that a discharge under § 727 will not discharge an individual from any debt caused by "[the] willful and malicious injury by the debtor to another entity or to the property of another entity.... 11 U.S.C. § 523(a)(6) (1998). Malice can be proved by a showing of implied or constructive malice. *Cladakis v. Triggiano (In re Triggiano)*, 132 B.R. 486, 490 (Bankr. M.D.Fla.1991). To establish implied or constructive malice "it is sufficient to show that [a debtor] deliberately and intentionally committed an act which he knew would necessarily injure a cognizable right of the creditor." *Id.* However, the debts arising from recklessly or negligently inflicted injuries do not fall within the willful and malicious injury exception to discharge under § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, ——, 118 S.Ct. 974, 978, 140 L.Ed.2d 90 (1998).

Therefore, to be successful under this subsection, Plaintiff must show: (1) an intentional action by the Defendant; (2) done with intent to harm; (3) which causes damage (economic or physical) to the Plaintiff; and (4) the injury is the approximate result of the action by the Defendant. *Turner v. Bryant (In re Bryant)*, 1997 WL 375692, at *8 (Bankr.M.D.Fla.1997).

The Court finds that the Defendant acted properly with regard to selling the 1961 Cessna airplane. Defendant admits the proceeds from the sale of the 1961 Cessna were not debited from his account and the money was subsequently used in the normal course of business. However, this was due to Plaintiff's mishandling of its loan account, not by a willful and malicious act of the Defendant. Defendant legitimately believed his account had been debited as the Plaintiff

issued an advice of debit and lien release on the 1961 Cessna. The Defendant had not realized the error had occurred because he had several pending sales on aircraft securing Plaintiff's loans at the time of the sale of the 1961 Cessna. Further, Defendant did not participate directly with insurance coverage of financed airplanes or with the general office administration at Certified. For the reasons discussed above, Plaintiff has failed to show that Defendant committed an intentional act he knew would harm the Plaintiff. Therefore, the Court finds that the debt owed by Defendant to Plaintiff is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

### CONCLUSION

The Court finds that Plaintiff has failed to meet its burden of proof in order to deny the Defendant his discharge pursuant to 11 U.S.C. § 727, or to except any debt owed by Defendant to Plaintiff from discharge pursuant to 11 U.S.C. § 523. Therefore, Defendant is entitled to a discharge under Chapter 7 of the Bankruptcy Code. The Court will enter a judgment consistent with these Findings of Fact and Conclusions of Law.