### In re SIMPSON, David M., Debtor.

### The Mirage–Casino Hotel and Treasure Island Corp., Plaintiffs,

v.

### David M. Simpson, Defendant.

**Bankruptcy No. 6:01–BK–05252–ABB.
Adversary No. 6:01–AP–00161–ABB.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Dec. 31, 2003.

Leigh R. Meininger, Orlando, FL, for Debtor.

## *Memorandum Opinion*

ARTHUR B. BRISKMAN, Bankruptcy Judge.

This cause came on the Complaint to Determine Debts as Non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) filed by Plaintiffs, The Mirage–Casino Hotel ("Mirage") and Treasure Island Corporation ("Treasure Island") (collectively, "Plaintiffs" or "Casinos") against Defendant, David M. Simpson ("Defendant"). The following Findings of Fact and Conclusions of Law are made after reviewing the evidence and arguments of counsel.

## *FINDINGS OF FACT*

Defendant filed chapter 7 on May 30, 2001. The Plaintiffs' filed claims against the Debtor. Mirage filed Claim Number Two (2) for one hundred thousand dollars ($100,000) and Treasure Island filed Claim Number Three (3) for one hundred thousand dollars ($100,000).

Plaintiffs filed this Complaint against Defendant to have their claims declared non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) and (a)(2)(C) on August 2, 2001. Defendant filed an answer to the Complaint.

The Plaintiffs are hotel-casinos located in Las Vegas, Nevada and have established credit procedures they followed in determining whether to extend credit to the Defendant. Beginning in 1999 Defendant applied for a twenty thousand dollar ($20,000) line of credit at each Casino. He was required to complete and sign credit applications. The Casinos' obtained information regarding Defendant's bank accounts, including current and average balances maintained. Following this initial credit evaluation, the Casinos' approved Defendant's requests and extended him separate twenty thousand dollar ($20,000) lines of credit.

Defendant gambled using his lines of credit. Each time he drew down on his credit line he was required to sign checks, drawn against his bank account, payable to the Casinos ("Markers"). Defendant was never allowed to draw down on his credit line unless he signed Markers. The Markers represented his express acknowledgement that he owed a debt to the casinos. The Casinos had the right to present the Markers to Defendant's bank if he failed to repurchase the Markers, however, Defendant's gambling status as a Disposition 3 Gambler entitled him to leave the Casinos before satisfying his outstanding Markers and to be invoiced later for any balance.

Defendant requested credit line increases from Plaintiffs between February and November 2000. Plaintiffs' approved his requests based on his bank account balances and gambling debt payment history ("Play and Pay"). He used these additions to his credit lines. Defendant paid off Markers between November 2000 and March 2001, paying sixty thousand dollars ($60,000) to Treasure Island and fifty thousand dollars ($50,000) to Mirage.

Defendant requested an increase in his credit lines to one hundred thousand dollars ($100,000) in March 2001. Before approving the credit line increase the Casinos reviewed Defendant's Pay and Play history and Florida bank account, which had a current balance of seventy ($70.00) to ninety dollars ($90.00) and an average balance of one thousand ($1,000.00) to three thousand dollars ($3,000.00). Plaintiffs' approved and increased his credit lines to one hundred thousand dollars ($100,000) with knowledge that Defendant's residence and banking accounts were both located in Florida.

Defendant returned to Las Vegas, Nevada and gambled at Plaintiffs' casinos using his one hundred thousand dollar ($100,000) credit lines. He executed twenty-two (22)

Markers, written on his Florida bank account, to the Plaintiffs, in the aggregate amount of two hundred thousand dollars ($200,000) and received gaming chips of equal value in exchange.

Defendant lost two hundred thousand dollars ($200,000) at the Casinos. Treasure Island presented Defendant's outstanding Markers, executed in its favor, to United Southern Bank, Defendant's Florida bank, but the Markers were dishonored and returned to Treasure Island marked "NSF" due to insufficient funds. Mirage did not present the Markers because it learned of the bankruptcy filing prior to presentment.

When Debtor's credit lines were raised to one hundred thousand dollars ($100,000) neither Casino relied on any representation by the Debtor. The Casinos relied instead on Debtor's Pay and Play history when they raised his credit lines. Debtor's gambling with and loss of two hundred thousand dollars ($200,000) at the Casinos constituted an expenditure on luxury goods and services.

## CONCLUSIONS OF LAW

Plaintiff's allege their claims should be excepted from discharge based on three (3) provisions of 11 U.S.C. § 523(a)(2).

### I. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code provides an exception from discharge for any debt for "money, property, services, or an extension, renewal, or refinancing of credit,"[1] to the extent obtained by—"false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[2]

To find a debt nondischargeable pursuant to section 523(a)(2)(A), a creditor must establish: (1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation.[3] A debt is excepted from discharge where it has been incurred by a debtor who knew at the time that there were neither current nor realistically foreseeable resources for payment.[4]

Fraud, pursuant to section 523(a)(2)(A), does not have to consist of an explicit fraud, but can also exist as a "concealment of a material fact."[5] False representation can be inferred from the record based on the circumstances.[6] Section 523(a)(2)(A) requires justifiable, not reasonable, reliance by the creditor.[7] It is a subjective standard.[8] The court examines the "particular qualities and characteristics of the plaintiff and circumstances of the particular case"[9] when determining if reliance was justified. The plaintiff's conduct must be reasonable and not the cause of the loss.[10]

1. 11 U.S.C. § 523(a)(2)(A).

2. 11 U.S.C. § 523(a)(2)(A).

3. *Lightner v. Lohn*, 274 B.R. 545, 549 (M.D.Fla.2002); *In re Hunter*, 229 B.R. 851, 858 (Bankr.M.D.Fla.1999).

4. *In re Kahn*, 261 B.R. 365, 367 (Bankr. D.Conn.2001); *In re Melancon*, 223 B.R. 300 (Bankr.M.D.La.1998).

5. *Id.* at 368.

6. *In re Davis*, 134 B.R. 990, 992 (Bankr. M.D.Fla.1991).

7. *In re Vann*, 67 F.3d 277, 280 (11th Cir. 1995).

8. *Id.*

9. *Lightner*, 274 B.R. at 550.

10. *In re Vann*, 67 F.3d at 283.

Plaintiffs did not rely Defendant's representations, but instead relied on Defendant's Pay and Play history. Plaintiffs' claim they also relied on Defendant's bank account information. Defendant's bank accounts, at the time of the credit increase to one hundred thousand dollars ($100,000), had an average balance of one thousand ($1000.00) to three thousand dollars ($3,000.00) and a current balance of seventy ($70.00) to ninety dollars ($90.00). Plaintiffs could not have reasonably relied on Defendant's bank account information. Plaintiffs' reliance instead was on Defendant's Pay and Play history, which they obtained independently of any representation from the Defendant. Plaintiffs did not rely on Defendant's representations and they have failed to establish their claims are non-dischargeable pursuant to section 523(a)(2)(A).

## II. 11 U.S.C. § 523(a)(2)(B).

Section 523(a)(2)(B) of the Bankruptcy Code provides that a debtor will not be discharged from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by:

use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.[11]

Plaintiffs did not reasonably rely on Defendant's bank account or balance informa-

tion. Their reliance instead was on Defendant's Pay and Play history, which they obtained independently of any representation from the Defendant. Plaintiffs did not rely on Defendant's representations and they have failed to establish their claims are non-dischargeable pursuant to section 523(a)(2)(B).

## III. 11 U.S.C. § 523(a)(2)(C).

Section 523(a)(2)(C) states,

for purposes of subparagraph (a) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,150* for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,150 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable: "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act [12]

There is no precise definition of what constitutes "luxury goods or services." [13] Courts analyzing the phrase have found a purchase to be a luxury when it is not "reasonably acquired for the support or maintenance of the debtor [or his/her dependents]." [14] This factual determination

---

11. 11 U.S.C. § 523(a)(2)(B).

12. 11 U.S.C. § 523(a)(2)(C).

13. *Id.*

14. *See In re Orecchio,* 109 B.R. 285 (Bankr. S.D.Ohio 1989).

is based on the debtor's circumstances and the character of the purchases.[15]

Defendant's incurred gambling debts of two hundred thousand dollars, denoted through his purchase of gaming chips, constitute a luxury good. The purchased gaming chips were not acquired for the maintenance or support of the Defendant, but were used for gambling activities. Defendant's gambling debts were for "luxury goods or services," incurred within 60 days of the filing of the bankruptcy petition, involved amounts exceeding $1,150, and are presumptively non-dischargeable. Defendant did not present any evidence[1] to rebut the presumption of non-dischargeability. Plaintiffs have established their claims as non-dischargeable pursuant to section 523(a)(2)(C).

## IV. Enforceability of gambling debts pursuant to Florida law.

Defendant contended Plaintiff's claims, constituting gambling obligations, were unenforceable pursuant to Florida law. The decisive question is whether the Plaintiffs' claims are enforceable. 11 U.S.C. § 101(5) defines "claim" as a "right to payment." [16] There would be no "right to payment" and the claims would be unenforceable if Florida law precluded enforcement of the Plaintiffs' claims. To determine the enforceability of Plaintiffs' claims a determination must first be made of whether Florida or Nevada law applies.

Federal courts generally apply the law of the state in which they sit when confronted with diversity cases.[17] Florida's choice of law rules are in conformity with this rule.[18] Parties may chose, through contractual language, the applicable law to govern their contracts, despite this general rule. There are several choice of law provisions contained in the contracts between the Plaintiffs and Defendant. The application Defendant signed stated,

> In the event legal action is brought to collect any amounts owed, I agree: 1) To submit to the jurisdiction of any state or federal court in Nevada; 2) That said action shall be governed by the laws of the state of Nevada; 3) To pay interest on the amounts due at the rate of 18% per annum; and 4) To payroll costs and attorney's fees incurred by you.[19]

Furthermore, Defendant's Markers, generated by the Plaintiffs stated,

> In consideration of our granting you credit you (1) acknowledge that your debt is incurred in Nevada, (2) agree to submit to the jurisdiction of any court,

---

**15.** *See In re Tabar*, 220 B.R. 701 (Bankr.M.D.Fla.1998)(finding Persian rugs, antique reproductions and floor coverings were luxury goods); *see also In re Hernandez*, 208 B.R. 872 (Bankr.W.D.Tex.1997)(finding items purchased to refurbish debtor's home on day before meeting with bankruptcy attorney were luxury items); *In re Orecchio*, 109 B.R. 285 (Bankr.S.D.Ohio 1989)(finding personal investment strategy tapes were luxury goods since they were not needed for debtor's support); *In re Herran*, 66 B.R. 323 (Bankr.S.D.Fla.1986)(finding clothing, giftware, cosmetics and fragrances were luxury goods); *In re Hussey*, 59 B.R. 573 (Bankr.M.D.Ala.1986)(finding three-wheel vehicle is a luxury good).

**16.** 11 U.S.C. § 101(5).

**17.** *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**18.** *See In re Taylor*, 260 B.R. 548, 558 (Bankr. M.D.Fla.2000) stating,

> In determining which state's law applies, a bankruptcy court applies the choice-of-law rules of the state in which it sits. *Hillsborough Holdings Corp. v. Celotex Corp.*, 166 B.R. 461, 468 (Bankr.M.D.Fla.1994). Therefore, in determining which state's law applies, the Court will look to the choice of law rules in effect in Florida.

*Taylor*, 260 B.R. at 558.

**19.** Adv. No. 01–161, (Doc. 33), Ex. A, App. 1.

federal or state, in Nevada to enforce this obligation...[20]

Nevada law would be applied under the contractual choice of law provisions.

The choice of law provisions between Plaintiffs and Defendant may have fallen within the narrow public policy exception to the general choice of law rules. In *Conflict of Laws*, 3rd edition, Professor Eugene F. Scoles, et al., state,

> The public policy exception to the enforcement of rights based on foreign law is to be construed narrowly: fundamental policies of the forum must be offended; mere difficulties between the law and the forum and of the foreign jurisdiction are not enough, nor may the denial of access to the local courts discriminate against a foreign cause of action which would be entertained if it had arisen locally. In circumstances when the test is satisfied, for instance with respect to gambling claims...[21]

In deciding when the public policy exception applies,

> The classic statement on this issue comes from Judge Cardoza in *Loucks v. Standard Oil Co.*[internal citation omitted] stating courts should not close their doors, unless application of the foreign law "would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal."[22]

█ The Florida Supreme Court analyzed the public policy exception in *Mazzo-ni Farms, Inc. v. E.I. DuPont De Nemours and Company*.[23] The court stated "[g]enerally, Florida enforces choice-of law provisions unless the law of the chosen forum contravenes strong public policy."[24] The court laid out several recent considerations of the public policy exception by Florida's appellate courts. Florida's Fourth Circuit Court of Appeals stated,

> Courts...should [proceed with] extreme caution when called upon to declare transactions as contrary to public policy and should refuse to strike down contracts involving private relationships on this ground, unless it is made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental policy of the right to freedom of contract between parties sui juris.[25]

The Florida's Second Circuit Court of Appeals stated,

> The fact that the law of the forum state is different than the law of the foreign state does not mean that the foreign state's law necessarily is against the public policy of the forum state. Instead, it is proper for the court to ascertain whether the foreign state's law is harmonious in spirit with the forum state's public policy.[26]

The Florida Supreme Court then stated in *Mazzoni*,

> Although courts have adopted varied formulations the underlying principle re-

---

**20.** Adv. No. 01–161, (Doc. 33), Ex. B.

**21.** Eugene Schols, et al., *Conflict of Laws* 139–140 (3rd ed., West Group 2000).

**22.** *Loucks v. Standard Oil Co.*, 224 N.Y. 99, 111, 120 N.E. 198, 202 (1918).

**23.** *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Company*, 761 So.2d 306 (Fla. 2000).

**24.** *See Punzi v. Shaker Adver. Agency, Inc.*, 601 So.2d 599 (Fla.2d Dist.Ct.App.1992).

**25.** *Pizza U.S.A. of Pompano Inc. v. R/S Assocs. of Fla.*, 665 So.2d 237, 239 (Fla. 4th Dist.Ct. App.1995), quoting *Bituminous Casualty Corp. v. Williams*, 154 Fla. 191, 17 So.2d 98, 101–02 (1944).

**26.** *See Punzi, supra* nt. 18 at 600.

mains the same: the countervailing public policy must be sufficiently important that it outweighs the policy protecting freedom of contract...routine policy considerations are insufficient to invalidate the choice-of-law provision.[27]

The public policy exception, set out by Florida's Supreme Court, appears to outweigh the choice of law provisions in the contract between the Plaintiffs and Defendant.

■ Application of Florida law would make the Plaintiff's claims unenforceable. The enforceability of gambling contracts in Florida is governed by Fla. Stat. ch. 849.26.[28] The statute makes gambling contracts, unless expressly authorized by Florida law, "void and of no effect." [29] "In interpreting Section 849.26, Florida courts have consistently held that gambling obligations, even if valid in the state in which they were undertaken, are unenforceable in Florida as contrary to law and public policy." [30]

■ Florida law would make the Plaintiff's claims unenforceable but, the United States Supreme Court in *Vanston Bondholders Protective Committee v. Green* [31] stated,

In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits...bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles.[32]

The bankruptcy clause of the United States Constitution delegates to Congress,

[T]he broad power "(T)o establish ... uniform Laws on the subject of Bankruptcies throughout the United States." *U.S. Const. art. I, s 8, cl. 4.* The Supreme Court has consistently proclaimed that the federal bankruptcy power is unrestricted and paramount, [citation omitted] and that Congress "may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt system." [33]

---

**27.** *Mazzoni Farms, Inc. v. E.I. DuPont Nemours and Company*, 761 So.2d 306 (Fla.2000).

**28.** Fla. Stat. ch. 849.26 (1991) states,

All promises, agreements, notes, bills, bonds, or other contracts, mortgages or other securities, when the whole or part of the consideration if for money or other valuable thing won or lost, laid, staked, betted or wagered in any gambling transaction whatsoever, regardless of its name or nature, whether heretofore prohibited or not, or for the repayment of money lent or advanced at the time of a gambling transaction for the purpose of being laid, betted, staked or wagered, are void and of no effect; provided, that this act shall not apply to wagering on pari-mutuels or any gambling transaction expressly authorized by law.

Fla. Stat. ch. 849.26 (1991).

**29.** *Id.*

**30.** *Froug v. Carnival Leisure Industries, Ltd.*, 627 So.2d 538, 539 (Fla. 3rd Dist.Ct.App. 1994); *see also Barquin v. Flores*, 459 So.2d 436 (Fla. 3rd Dist.Ct.App.1984); *see also Carp v. Florida Real Estate Commission*, 211 So.2d 240 (Fla. 3rd Dist.Ct.App.1968); *see also Dorado Beach Hotel Corporation v. Jernigan*, 202 So.2d 830 (Fla. 1st Dist.Ct.App.1967); *see also Young v. Sands*, 122 So.2d 618 (Fla. 3rd Dist.Ct.App.1960).

**31.** *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946).

**32.** *Id.* at 329 U.S. 156, 162–63, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946).

**33.** *In re Nashville White Trucks, Inc.*, 22 B.R. 578, 582–583 (Bankr.Tenn.1982); *see also United States v. Fox*, 95 U.S. 670, 672, 24 L.Ed. 538 (1878).

It, therefore, becomes important to note that the grant of the bankruptcy power in its final form, although related to commerce, was not included in clause 3, which gives to Congress the power 'to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.' From that it is fair to infer that the draftsmen did not wish to restrict the bankruptcy grant as they had done the power over commerce. Congress was to have an all-inclusive power, through the bankruptcy grant, to enact any legislation reasonably framed and related to the subject of bankruptcies, which in turn is indissolubly linked to commerce and credit.[34]

Congress has used this power to give "claim" a broad meaning. 11 U.S.C. § 101(5) defines claim as,

[The] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . [35]

By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.[36]

This broad definition of "claim" specified by Congress suggests application of "conflict preemption,"[37] because "compliance with both state and federal law would be impossible, or state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[38]

The term "claim" is given the broadest possible meaning due to the Congressional intent to bring all legal obligations of a debtor within the bankruptcy case. Application of conflict preemption subrogates Florida's statutory provision of non-enforcement of gambling debts to the comprehensive federal bankruptcy scheme crafted by Congress, through the authority of the United States Constitution. Plaintiff's claims for gambling debts, normally unenforceable in Florida are deemed enforceable. Therefore it is,

**ORDERED and ADJUDGED** that Plaintiffs, The Mirage–Casino Hotel and Treasure Island Corporation's claims against Defendant, David M. Simpson, are excepted from Defendant's discharge pursuant to 11 U.S.C. § 523(a)(2)(c) pursuant to the Order entered contemporaneously.

### ORDER

This cause came on the Complaint to Determine Debts as Non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) filed by Plaintiffs, The Mirage–Casino Hotel ("Mirage") and Treasure Island Corporation ("Treasure Island") (collectively, "Plaintiffs" or "Casinos") against Defendant, David M. Simpson ("Defendant"). After reviewing the pleadings and evidence, and hearing live testimony and arguments of counsel, and in conformity with the **Memorandum Opinion** entered contemporaneously herewith, it is

---

**34.** 1 Collier on Bankruptcy P 0.02, at 5 (14th ed.1974).

**35.** 11 U.S.C. § 101(5).

**36.** Revision Notes and Legislative Reports to 11 U.S.C. § 101(5) at ¶ (4) (1978).

**37.** *Keams v. Tempe Technical Institute, Inc.,* 39 F.3d 222, 225 (9th Cir.1994).

**38.** *In re World Auxiliary Power Company,* 303 F.3d 1120, 1129 (9th Cir.2002).

**ORDERED, ADJUDGED and DE-CREED** that **JUDGMENT** is entered in Favor of Plaintiffs, The Mirage–Casino Hotel and Treasure Island Corporation and Against Defendant, David M. Simpson; it is further,

**ORDERED, ADJUDGED and DE-CREED** that Plaintiff, The Mirage–Casino Hotel's claim, in the amount of one hundred thousand dollars ($100,000) is excepted from Defendant, David M. Simpson's discharge pursuant to 11 U.S.C. § 523(a)(2)(c); it is further,

**ORDERED, ADJUDGED and DE-CREED** that Plaintiff, Treasure Island Corporation's claim, in the amount of one hundred thousand dollars ($100,000) is excepted from Defendant, David M. Simpson's discharge pursuant to 11 U.S.C. § 523(a)(2)(c).