235 B.R. 683 (1999)
In re Earle Elwin BERGHMAN, Debtor.
Gordon P. Jones, Trustee of the estate of Earle Elwin Berghman, Plaintiff,
v.
J.G. Wentworth S.S.C. Limited Partnership and Earle Elwin Berghman, Defendants.
Bankruptcy No. 98-07422-3F7. Adversary No. 98-254.
United States Bankruptcy Court, M.D. Florida, Jacksonville Division.
July 7, 1999.
*684 *685 Raymond R. Magley, Jacksonville, Florida, for trustee.
Robert Altman, Palatka, Florida, for debtor.
Robert L. Young, Orlando, Florida, for Wentworth.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
JERRY A. FUNK, Bankruptcy Judge.
This Proceeding is before the Court upon a Complaint to Determine Interest in Property and for Declaratory Judgment filed by Gordon P. Jones ("Plaintiff"), as Chapter 7 Trustee for the Estate of Earle Elwin Berghman, on November 2, 1998. (Doc. 1.) Plaintiff sues Earle Elwin Berghman ("Debtor") and J.G. Wentworth, S.S.C. Limited Partnership ("Wentworth") pursuant to Federal Rule of Bankruptcy Procedure 7001 to determine an interest in annuity payments and other declaratory relief. On December 1, 1998 Debtor filed an answer. (Doc. 5.) On December 15, 1998, Wentworth filed an answer, a counterclaim against Plaintiff, and a crossclaim against Debtor. (Doc. 6.) A trial was conducted on March 23, 1999. After the presentation of evidence, the Court asked each party to submit a memorandum of law, proposed findings of fact and conclusions of law, and a proposed final judgment within sixty days.[1] Upon review of the evidence presented and the submissions of counsel, the Court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT
The facts underlying this proceeding are not in dispute. On or about November 28, 1979. Debtor incurred personal injuries while working for National Railroad Passenger Corporation ("National Railroad") in Attleboro, Massachusetts. On April 25, 1984. Debtor signed a General Release of All Claims releasing National Railroad of all liability for Debtor's personal injuries in exchange for a structured settlement.[2]
On May 7, 1984, National Railroad paid $114,151.00 to the Prudential Insurance *686 Company of America ("Prudential") as consideration for any annuity to facilitate the payment of the structured settlement between Debtor and National Railroad. Annuity Contract No. A 44698, listing Earle Elwin Berghman as the Annuitant, provides in a section titled "Ownership and Control" that:
This contract is amended at issue to provide that except as we may state below, all rights of ownership and control will belong to the
National Railroad Passenger Corporation, of Washington, D.C., its successors or assigns.
The owner(s) with no one else's consent, is entitled to any benefit and value, and to the exercise of any right and privilege granted by the contract or by us.
Debtor received periodic payments under the settlement agreement by receipt of regular annuity payments from Prudential for twelve years. On March 27, 1996 Debtor needed some money.[3] To facilitate his needs. Debtor entered into a Purchase Agreement with Wentworth. Gary L. Smith, Esquire, of Melbourne, Florida represented Debtor with respect to the Purchase Agreement. Mr. Smith sent a letter to Wentworth on March 27, 1996 that set forth that he had explained the terms of the transaction to Debtor and that he was satisfied that Debtor understood the nature and terms of the transaction to occur under the Purchase Agreement.
The Purchase Agreement provided in pertinent part that:
A schedule of certain of the Periodic Payments to be sold hereunder is attached to this Agreement as Exhibit "A"
Seller [Debtor] desires to sell and assign to Purchaser [Wentworth] all of its right, title and interest in and to the right to receive payments under the Release, as described on Exhibit "A" and all economic benefits of such agreements, including all of his right, title and interest in and to the Periodic Payments as described on Exhibit "A" and Purchaser desires to purchase such rights and benefits, all on the terms and under *687 the conditions set forth in this Agreement. . . .
1. Purchase and Sale. a. Seller hereby sells, transfers, assigns, sets over and conveys to Purchaser, all right, title and interest of the Seller in, to his right to receive payments under the "Assigned Assets", as defined in subsection 1.c. below, and, in reliance on the representations, warranties and covenants of Seller contained herein. Purchaser hereby purchases and accepts the assignment of all right, title and interest of the Seller in and to the right to receive the Assigned Assets.
c. The "Assigned Assets" shall mean all right, title and interest of Seller in, to and under its right to receive under the Release, the Settlement Agreement, the payments listed in Exhibit "A", the right to receive the "qualified funding asset" as defined in the Qualified Assignment as set forth on Exhibit "A" and any interest on the proceeds of all of the above, and all of the Seller's present or future right, title and interest to sell, assign, transfer, cause an early termination of, settle, receive consideration for, or undertake any similar activity with respect to any of the above as such relate to the Schedule of Periodic Payments on Exhibit "A".
2. . . . It is the intention of the parties hereto that the provisions of this Agreement constitute the purchase and sale of all of Seller's right, title and interest in, to his right to receive payments under the Assigned Assets, and not a loan. . . .
4a. Seller owns (and is selling and assigning to Purchaser hereunder) all right, title and interest in and to its right to receive payments under the Assigned Assets, free and clear of all liens, charges, security interests, encumbrances, and agreements of any nature whatsoever (other than this Agreement), and upon the execution and delivery of this Agreement, no party other than the Purchaser shall have any present or future right therein or thereto.
4d. Seller is competent to enter into this Agreement, understands the terms and provisions of this Agreement and has been represented by tax and accounting advisors and counsel in the negotiation and execution of this Agreement.
4g. Seller has valid reasons for selling his interests in the Assigned Assets rather than obtaining a loan with the Assigned Assets as collateral.
4h. This Agreement constitutes a valid transfer, assignment, set-over and conveyance to the Purchaser of all right, title and interest of the Seller in, to and under the right to receive the Assigned Assets now existing and hereafter created.
4k. Seller has not, prior to the date hereof, sold or assigned its rights to receive the Assigned Assets or any part thereof. . . .

Exhibit A. Purchaser is hereby purchasing from the Seller under the Annuity: 37 monthly payments of $500.00 each starting 5/7/1996 and ending on 5/7/1999 with 1 lump sum payment of $25,000.00 due on 5/7/1999.
(Wentworth's Ex. 3.) (emphasis added). On May 13, 1996, June 13, 1996, September 18, 1996 and June 6, 1997, Debtor and Wentworth entered into Amendments to the Purchase Agreement, whereby Debtor sold[4] Wentworth additional Periodic Payments.[5] Pursuant to the Purchase Agreement, *688 Debtor sent a letter to Prudential directing that future payments under the annuity be sent to a new address. This address was maintained by Wentworth ("Wentworth Address") for the purpose of receiving these and other structured settlement payments purchased by it in the ordinary course of its business.
On June 6, 1997 Debtor wrote a letter, presumably to Wentworth, providing:
Dear Sir or Madam,
Previous payments that were sold are in my file.
An attorney witnessed my transactions on my behalf.
This newest sale is only a simple addition added to prior sale of payments.
This sale is for the $50,000.00 lump sum payment due 5/7/2004. When this payment arrives my entire debt will be paid. I will be appr. 57 years old.
This company has made my life tremendously better being able to sell my payments.
(Wentworth's Ex. 9.)
In September of 1997, Debtor contacted Prudential without Wentworth's consent and directed Prudential to cease sending payments to the Wentworth Address and to send them to Debtor's personal address. Debtor retained possession of the annuity payments, rather than turn them over to Wentworth.
On November 12, 1997 Wentworth filed a Complaint and Confession of Judgment in the Philadelphia County Court of Common Pleas in the state of Pennsylvania. (Debtor's Ex. 8.) The complaint stated that:
3. On or about March 27, 1996, again via amendment on May 13, 1996, again via amendment on June 13, 1996, again via amendment September 18, 1996, and again via amendment June 16, 1997. Wentworth and Berghman [Debtor] entered into a purchase agreement . . . whereby J.G. Wentworth purchased from Berghman his right to receive certain periodic annuity payments . . .
4. On or about March 27, 1996, again via amendment on May 13, 1996, again via amendment on June 13, 1996, again via amendment September 18, 1996, and again via amendment June 16, 1997, in consideration for and as a result of Berghman's representations and warranties, and the right to receive Payments, J.G. Wentworth paid $90,500.00 to Berghman.
9. The Payments purchased by J.G. Wentworth were a steam (sic) of monthly payments and lump sum payments as follows: 37 payments of $500.00, one lump sum of $25,000.00, 36 payments of $500.00, 35 payments of $500.00, 36 payments of $1,500.00, 24 payments of $1,500.00 and one payment of $50.000.00 for a total of $219,000.00.
Along with the complaint, Wentworth filed additional pleadings with the Pennsylvania Court to support its complaint. (Debtor's Ex. 8.) A writ of execution was indexed on November 19, 1997. This writ directed the sheriff of Philadelphia County to garnish payments from Prudential Insurance Company in order to satisfy "the judgment, interest and costs against" Debtor. Between September 1997 and April 1999, Debtor, and not Wentworth, received $14,500.00 of annuity payments.[6]
*689 On September 11, 1998. Debtor filed a petition for Chapter 7 bankruptcy relief. Debtor listed total assets of $326,050.00 and total liabilities of $319,620.39, $290,179.28 of which is listed as unsecured. Debtor lists a homestead valued at $45,000.00 with a secured claim of $29,441.11 for a first mortgage on his home. Debtor's Schedule C  Property Claimed as Exempt lists the Prudential Annuity as an exempt asset under Florida Statutes § 222.14 and having a current market value of $325,000.00. Debtor's Schedule F  Creditors Holding Unsecured Nonpriority Claims lists Wentworth as having an unsecured nonpriority claim in the amount of $196,000.00. Debtor did not list any unsecured priority claims. Debtor listed current income of $770,00 per month from social security in his Schedule I  Current Income of Individual Debtor(s).[7] Debtor lists $2,308.00 of monthly expenses in his Schedule J  Current Expenditures of Individual Debtors.
At trial, David Reape, vice president on operations for Wentworth, testified that at all times he understood the transaction between Wentworth and Debtor to be the purchase of Debtor's right to receive payments. Mr. Reape testified that Wentworth is in the business of purchasing the right to receive payments coming from royalties, structured settlements, and lotteries, but that Wentworth is not a lender and never has been in the loan business. Clients will contract with Wentworth directly or go through brokers for Wentworth. In 1996, Mr. Jones, a broker for Wentworth, received documents regarding the proposed sale, initiated the underwriting procedure, and then sent a contract to Debtor. Mr. Reape stated that all sellers are required to be represented by counsel.
Payment to Wentworth was accomplished by the annuity payments being made in the name of Earle Berghman to a Cincinnati address, which was a lock box address for Wentworth. When payment was interrupted, Wentworth sought a garnishment to redirect payments. Wentworth's procedure when payment is interrupted in any transaction. The garnishment was done prior to Debtor filing for bankruptcy protection. Mr. Reape additionally testified that Wentworth has no right to sue Prudential because the contract is between Debtor and Wentworth. (Tr. 96.)
Plaintiff seeks a declaratory judgment from this Court that Debtor could not assign annuity payments to Wentworth and therefore, that the annuity payments are property of the estate.[8] Plaintiff claims in its complaint that "the language of the annuity states that National Railroad is the owner of the annuity and, therefore, only it can assign payments. Therefore, the purchase agreement does not constitute a valid legal assignment." (Doc. 1.) Plaintiff also requests that the Court declare that Plaintiff is entitled to receive annuity payments based on its objection to Debtor's claim of exemption. Wentworth counterclaims against Plaintiff seeking the Court to declare that Debtor validly assigned all his rights and interests to the annuity payments and, alternatively, that the transaction constituted a loan to which Wentworth is perfected. Additionally, Wentworth crossclaims against Debtor seeking to except $196,036.99 from Debtor's discharge pursuant to § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6).

CONCLUSIONS OF LAW
a. Property of the Estate
The primary issue that the Court addresses is whether payments sold by *690 Debtor to Wentworth pursuant to the Purchase Agreement[9] are property of the estate. When a debtor files a petition for bankruptcy protection, "all legal or equitable interests of the debtor in property as of the commencement of the case" become property of the estate. 11 U.S.C. § 541(a)(1) (1998); In re Burnsed, 224 B.R. 496, 498 (Bankr.M.D.Fla.1998); Grant v. Himmelstein (In re Himmelstein), 203 B.R. 1009, 1011 (Bankr. M.D.Fla.1996). Deciding whether a debtor's interest constitutes "property of the estate" is a federal question. In re Lewis (Charles R. Hall Motors, Inc. v. Lewis), 137 F.3d 1280, 1282 (11th Cir.1998). However, "the nature and existence of the [debtor's] right to property is determined by looking at state law." Southtrust Bank of Alabama v. Thomas (In re Thomas), 883 F.2d 991, 995 (11th Cir.1989); See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).
At the outset of this opinion, the Court notes much similarity with Judge George L. Proctor's recent decision in In re Freeman, 232 B.R. 497 (Bankr.M.D.Fla.1999). In the Freeman case, just as in the case at hand, the debtor entered a purchase agreement where he received money in exchange for his right to receive payment from an annuity purchased to fund a structured settlement.[10] 232 B.R. at 498. However, in the Freeman case, evidence of the anti-assignment provision was not introduced and the argument as to ambiguity of the purchase agreement was not raised.
In the Freeman case, the debtor contended that because there was an anti-assignment clause in the annuity, he could not validly transfer or assign annuity proceeds and therefore those proceeds were property of the estate. Id. at 500. Wentworth, just as in this case, claimed the assignment was valid and that Wentworth possessed the right to receive the annuity payments. Id. After discussing Florida law concerning the validity of anti-assignment provisions and noting that the actual anti-assignment clause was not in evidence, Judge Proctor found that the debtor validly assigned his right to receive payments to Wentworth. Id. at 503. Therefore, the debtor no longer had a right to receive annuity payments and the stream of payments did not become property of the estate at the commencement of the debtor's case. Id.
Generally, contract rights can be assigned unless they involve obligations of a personal nature, public policy is against such assignment, or such assignment is specifically prohibited by the contract. New Holland, Inc. v. Trunk, 579 So.2d 215 (Fla.Dist.Ct.App.1991). The Court restates below the language at issue which Plaintiff and Debtor claim prohibited Debtor's assignment to Wentworth.
This contract is amended at issue to provide that, except as we may state below, all rights of ownership and control will belong to the
National Railroad Passenger Corporation, of Washington, D.C., its successors or assigns.
The owner(s) with no one else's consent, is entitled to any benefit and value, and to the exercise of any right and privilege granted by the contract or by us.
The Restatement (Second) of Contracts, § 322(1), provides that "[U]nless the circumstances indicate the contrary, a contract term prohibiting assignment of "the contract" bars only the delegation to an assignee of the performance by the assignor of a duty or condition. This prohibition of the contract prevents assignment *691 of contractual duties, but does not prevent assignment of the right to receive payments due unless the circumstances indicate the contrary." Aldana v. Colonial Palms Plaza, Ltd., 591 So.2d 953 (Fla.Dist. Ct.App.1991). See Charles L. Bowman & Co. v. Erwin, 468 F.2d 1293, 1297 (5th Cir.1972); Cedar Point Apartments, Ltd. v. Cedar Point Investment Corp., 693 F.2d 748, 753 (8th Cir.1982), cert. denied, 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983).
While Debtor's assignment of payments from an annuity purchased to facilitate a structured settlement agreement frustrates the intent of that agreement, this Court finds no legal basis to invalidate the transaction between Debtor and Wentworth. See First Colony Life Ins. Co. v. Sun State Capital Funding, Inc., 730 So.2d 735 (Fla.Dist.Ct.App.1999) (suggesting a need for additional state regulation of structured settlement agreements to protect the beneficiaries of those agreements); See also Western United Life Assurance Co. v. Hayden, 64 F.3d 833 (3rd Cir.1995) (discussing structured settlements). The language of the annuity contract did not specifically prohibit the sale of Debtor's right to receive payments. Nor do the circumstances indicate that the assignment of the right to receive payments was meant to be prevented or prohibited.
The Court finds additional support from the doctrine of equitable assignments allowing courts of equity to "recognize certain kinds of instruments as valid equitable assignments, where it is necessary to effectuate the plain intent of the parties or where to hold otherwise would be unjust." Giles v. Sun Bank, 450 So.2d 258, 260 (Fla.Dist.Ct.App.1984). See F.D.I.C. v. Fidelity Elecs. Ltd. (In re Fidelity Elecs. Ltd.), 52 B.R. 475, 478, 479 (Bankr. S.D.Fla.1985). It is clear to the Court that the parties intended a sale of the right to receive payments[11] and that deeming the transaction otherwise would clearly be unjust. The right to receive payments purchased by Wentworth under the Purchase Agreement is not property of Debtor's bankruptcy estate.
Debtor argues that the Purchase Agreement is ambiguous and asks whether Wentworth is purchasing the right to receive payments or the direct payments under the Purchase Agreement. The Court does not find any such ambiguity and therefore need not construe the purchase agreement against the drafter as Debtor wishes. The Purchase Agreement is clear. Additionally, Debtor had an attorney to review and explain the Purchase Agreement to him prior to entering the Purchase Agreement.
b. Exception to Discharge
Wentworth crossclaims against Debtor seeking to except $196,036.99 from Debtor's discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6). Upon finding that the right to receive payments from the annuity belongs to Wentworth and did not become property of the estate, Wentworth's claim to exceptions should only apply to payments that Wentworth was to receive pre-petition but did not due to the fact that such payments were misdirected to Debtor and Debtor did not turn them over to Wentworth.
The Court notes that Wentworth only references 11 U.S.C. § 523(a)(2)(A) and (a)(4) in the post-trial brief submitted to this Court. (Doc. 28.) However, the Court finds, as Wentworth plead, that Debtor's conduct and the circumstances surrounding that conduct are sufficient to satisfy the elements of 11 U.S.C. § 523(a)(6). Additionally, upon finding that the annuity payments are not property of Debtor's estate, the amount Wentworth seeks to have excepted from Debtor's discharge is $14,500.00.[12]
*692 Section 523 provides, in pertinent part, that:
A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt 
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by 
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;
While the fundamental goal of the Bankruptcy Code is to provide the honest debtor with a fresh start, such a policy must be tempered by the need to prevent dishonest debtors from using the law as a shield. Bracco v. Pollitt (In re Pollitt), 145 B.R. 353, 355 (Bankr.M.D.Fla.1992). Accordingly, under the circumstances prescribed in Section 523 certain debts will be excepted from a debtor's discharge. Subsections (a)(2) and (a)(6) are most applicable to the case at hand.
The Court in looking to the facts finds that the elements of 11 U.S.C. § 523(a)(2)(A) are satisfied. Debtor contracted with Wentworth to receive money in exchange for his right to receive payments. Upon entering the Purchase Agreement, Wentworth paid Debtor and Debtor initially abided by the terms of the agreement he made by having payments sent to Wentworth. However, Debtor ceased to do so and then redirected payments to himself at a time when he no longer had an interest in such payments. This behavior rises to a level of theft, in that Debtor took payments with the intent to permanently deprive Wentworth of payments belonging to Wentworth.
At the time of the Purchase Agreement and amendments thereto, Debtor represented that payments would be turned over to Wentworth. Wentworth reasonably relied on this representation and performed under the Purchase Agreement by paying Debtor money for the right to receive payments in the future. Debtor then took both the money from Wentworth and subsequently the payments previously sold for his own use, an action that caused Wentworth to sustain a pre-petition loss of $14,500.00.
The Supreme Court clarified the meaning of the term "willful" stating that:
The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. . . . Moreover, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."
Kawaauhau v. Geiger, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (citations omitted). Debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6). Id. Debtor's behavior amounts to a conversion. Debtor routed previously sold payments back to him never really intending to turn them over to Wentworth. At the point Debtor rerouted the payments to himself, Debtor held no interest in such payments. The payments were no longer Debtor's property; rather these payments were the legal property of Wentworth. The Court finds that Debtor's actions fall within the Supreme Court's intended meaning of willful and malicious injury to property of another. Accordingly, Wentworth's prepetition loss of $14,500.00 is a debt that will be excepted from Debtor's discharge.
*693 Additionally, the Court notes that all post-petition annuity payments belong to Wentworth and should be turned over to Wentworth immediately. Any deficit from the full amount of post-petition funds due to Wentworth, derived from Debtor receiving and spending such funds, is a debt owed to Wentworth and Wentworth may seek to collect such debt in an appropriate forum.
c. Objection to Exemption
Wentworth's Objection to Exemptions is also before the Court. Annuities used to fund structured settlement agreements have been found not to fall within Florida's exemptions for annuities provided in Florida Statutes § 222.14.[13]Guardian Life Inc. Co. v. Solomon (In re Solomon), 95 F.3d 1076 (11th Cir.1996). However, upon the distinguishable facts of this case[14] and the broad interpretation of the meaning of annuity by the Supreme Court of Florida, the Court finds that any interest that Debtor did not sell under the Purchase Agreement and amendments thereto is exempt property under Florida Statutes § 222.14. See LeCroy v. McCollam (In re McCollam), 986 F.2d 436 (11th Cir.1993) (Supreme Court of Florida broadly interprets meaning of annuity upon certification of question by the Eleventh Circuit Court of Appeals).

CONCLUSION
While the Court is sympathetic toward that which results from Debtor's poor financial management, and what this Court perceives as a gambling problem, there is just no basis to find that Debtor's right to receive payments under the annuity was property of the estate upon Debtor's filing for bankruptcy protection. Additionally, the facts support the requisite burden necessary to except the debt created by Debtor's redirecting annuity payments to himself that Debtor had already validly sold to Wentworth. Finally, Debtor's remaining interest in the annuity is exempt under state law.
A separate Order will be entered in accordance with these Findings of Fact and Conclusions of Law.

JUDGMENT
This Proceeding is before the Court upon a Complaint to Determine Interest in Property and for Declaratory Judgment filed on November 2, 1998 by Gordon P. Jones ("Plaintiff"), as Chapter 7 Trustee for the Estate of Earle Elwin Berghman. (Doc. 1.) J.G. Wentworth, S.S.C., Limited Partnership ("Wentworth") counterclaimed against Plaintiff and crossclaimed against Debtor. (Doc. 6.) In accordance with the findings of fact and conclusions of law separately entered, it is ORDERED and ADJUDGED:
1. Debtor's right to receive payment under the annuity contract was validly sold to Wentworth. Payments noted in the Purchase Agreement and amendments thereto are the property of J.G. Wentworth, S.S.C., Limited Partnership.

*694 2. Annuity payments and the right to receive such payments, not included in the Purchase Agreement and amendments thereto are exempt property belonging solely to Debtor pursuant to Florida States § 222.14.
3. Debtor, Earle Elwin Berghman, is indebted to J.G. Wentworth, S.S.C., Limited Partnership in the amount of Fourteen Thousand Five Hundred Dollars ($14,500.00) which is excepted from Debtor's discharge, for which let execution issue.
4. The Preliminary Injunction issued by this Court on May 4, 1999 is lifted.
ORDER DENYING AS MOOT THE MOTION OF J.G. WENTWORTH SEEKING RELIEF FROM AUTOMATIC STAY
This Case is before the Court on the Motion of J.G. Wentworth Seeking Relief from Automatic Stay and Other Relief Pursuant to 11 U.S.C. Section 362 (Doc. 7) filed on October 9, 1998. In the Findings of Fact and Conclusions of Law issued in Jones v. J.G. Wentworth S.S.C. Ltd Partnership (In re Berghman), Adversary Number 98-254 (Bankr.M.D.Fla. June 25, 1999) this Court found that Earle Elwin Berghman's right to receive payments under the annuity contract was validly sold to J.G. Wentworth and payments noted in the Purchase Agreement and amendments thereto are the property of J.G. Wentworth. Accordingly, it is ORDERED:
The Motion of J.G. Wentworth Seeking Relief from Automatic Stay and Other Relief Pursuant to 11 U.S.C. Section 362 filed on October 9, 1998 is denied as moot.
NOTES
[1] Debtor's counsel, Robert Altman, submitted these items with a cover letter indicating an understanding that Trustee's counsel, Raymond R. Magley, would not file separate submissions and stands on the arguments made in Debtor's submissions with respect to the issue of whether annuity payments are property of the estate.
[2] The schedule of payments to Debtor under the structured settlement is as follows:

a. $10,000.00 payable upon execution of the release.
b. $500.00 per month for a period of ten years.
c. After ten years, $1,500.00 per month for the next ten years.
d. After twenty years, payment of $2,500.00 per month until the date of Debtor's death.
e. After five years from the date of execution, $10,000.00 lump sum payment to Debtor.
f. After ten years from the date of execution, $15,000.00 lump sum payment to Debtor.
g. After fifteen years from the date of execution, $25,000.00 lump sum payment to Debtor.
h. After twenty years from the date of execution, $50,000 00 lump sum payment to Debtor.
i. After twenty five years from the date of execution, $50,000.00 lump sum payment to Debtor.
j. After thirty years from the date of execution, $100,000.00 lump sum payment to Debtor.
[3] In his application for sale of annuity payments (Wentworth's Ex. 10), Debtor stated that he needed money for tools and for a down payment on a home. However, when asked at trial why he needed the money and why he contacted Colonial Finance Services. Inc. ("CFS"), a broker for Wentworth. Debtor stated "I had come down from Maine, and I had suffered a civil loss in the state of Maine. I had three children to take care of, my girlfriend, myself. I was always the supporter in the household. And we wanted to purchase a home, and that was the intention. I don't know anything about any business dealings." (Tr. at 32-33.) Debtor testified that he called CFS after reading an ad in the Melbourne newspaper and spoke with Chip Jones. (Tr. at 31-31.) Mr. Jones requested that Debtor send him certain information and complete an application.

The Court finds that the real reason for Debtor's need of money was for gambling. None of Debtor's testimony concerning why he had an immediate need for money was credible. Each time that Debtor was asked about why he needed money he had a different response. There was talk of purchasing a home, then talk of buying a motorcycle for resale for profit, and the application that specifically states "tools" that Debtor turns around and says he had no idea of any business dealings. The sad truth is that Debtor's testimony is far from credible and that he got the money from Wentworth, lost a large amount of the money due to gambling, filed for bankruptcy protection, and now seeks to have the transaction reversed, with Wentworth holding the bag. Debtor admits that gambling was a pastime of his for a long time and that he gambled everywhere. (Tr. at 59, 63.) Debtor could not account for the gambling losses out of the first $75,000.00 he received from Wentworth, but stated it was at least $30,000.00. (Tr. at 64.)
[4] Wentworth claims this was not a sale but rather a prepetition irrevocable transfer by Debtor.
[5] Mr. Smith made additional correspondence to Wentworth on June 25, 1997 concerning these subsequent transactions. In his June 25, 1997 letter Mr. Smith states that he "has verified the `location' of the Seller [Debtor] . . . in order that UCC-1 Financing Statements may be filed in the appropriate jurisdictions." Additionally, Debtor's Exhibit 10 is a check from Gary L. Smith to Debtor for $25,000.25 for "Annuity Loan J.P. Wentworth". The Court does not find this evidence persuasive in Debtor's position that the transaction was a loan rather than a purchase of a property interest. Additionally, the Purchase Agreement specifically provides that the transaction was not a loan and Debtor agreed that he understood that it was not to be a loan. (Wentworth's Ex. 3.)
[6] On May 12, 1999, the Court entered an Order on Motion of Defendant, J.G. Wentworth S.S.C. Limited Partnership, for Preliminary Injunction. (Doc. 27.) That Order directed Debtor to turn over to the Chapter 7 Trustee a $25.000.00 annuity payment received by Debtor in May 1999. The Order also directed Debtor to turn over to the Trustee $750.00 of each $1,500.00 monthly annuity payment beginning with the May 1999 payment until further order of the Court.
[7] Noted at the bottom of this schedule is the statement "Debtor collects $1,500.00 per month from a structured annuity (1984). The annuity has been levied upon by J.G. Wentworth."
[8] While Debtor is a defendant in this proceeding, Plaintiff represented to the Court at trial that he and Debtor are on the same side of the issue of whether the annuity payments are property of the estate.
[9] Reference to the "Purchase Agreement" shall hereinafter mean the March 27, 1996 Purchase Agreement as amended by Amendments dated May 13, 1996, June 13, 1996, September 18, 1996 and June 6, 1997.
[10] The Freeman case came before the Court upon a Motion for Sanctions for J.G. Wentworth's failure to release a Writ of Garnishment on annuity payments that Debtor alleged were property of the estate pursuant to 11 U.S.C § 541, 232 B.R. at 498.
[11] The Court does not find Debtor's testimony that he intended this to be a loan to be credible, all other evidence before the Court suggests otherwise.
[12] Wentworth has the burden of proving that the debt should be excepted from Debtor's discharge by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).
[13] Florida Statutes § 222.14 states:

The cash surrender values of life insurance policies issued upon the lives of citizens or residents of the state and the proceeds of annuity contracts issued to citizens or residents of the state, upon whatever form, shall not in any case be liable to attachment, garnishment or legal process in favor of any creditor of the person whose life is so insured or of any creditor of the person who is the beneficiary of such annuity contract, unless the insurance policy or annuity contract was effected for the benefit of such creditor.
Fla.Stat. § 222.14 (West 1998).
[14] The Solomon case is factually distinguishable from this case. See In re Solomon, 166 B.R. 998 (Bankr.S.D.Fla.1994). Both cases involved claims for exemptions under Florida Statutes § 222.14 for annuities purchased by parties to whom the debtors released liability and settled claims. However, in the case at hand Debtor was named `Annuitant' in the annuity contract, while in the Solomon case payments were "payable to Union Mutual [the party the debtor settled with] or at its direction", not to the debtor. See In re Solomon, 186 B.R. 535 (S.D.Fla.1995).