In re Marci DEJULIO, Debtor.

**Master Financial, Inc. Plaintiff,**

v.

**Marci DeJulio, Defendant.**

**No. 03–04395–3F7.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Jan. 10, 2005.

Order entering judgment; Jan. 11, 2005.

Walter Sanders, for Plaintiff.

Bradley Markey, for Defendant.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This adversary proceeding came before the Court upon a complaint filed by Master Financial, Inc. ("Plaintiff"). Plaintiff seeks to have the debt owed to it by Marci DeJulio ("Defendant") excepted from Defendant's discharge pursuant to 11 U.S.C. § 523(a)(2)(B)[1]. The Court conducted a trial on August 5, 2004 and took the matter under advisement. Upon review of the evidence entered at trial and upon review of the post-trial submissions, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

During the latter part of 2001 Defendant, an administrative assistant for a commercial construction company earning approximately $2,917.00 monthly, met with J.R. Parker, a real estate investor, in order to obtain a mortgage loan. (Tr. at 13, 20). Defendant completed a loan application and provided Parker with W-2's and pay stubs documenting her income. (Tr. at 19). Parker submitted the application and documentation to Monarch Mortgage, who approved Defendant for a loan.[2] (Tr. at 19). Defendant did not feel comfortable with Parker and decided not to do business with him. (Tr. at 20).

---

[1] Although the Complaint sought an exception to Defendant's discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A)(Count I) and 523(a)(2)(B)(Count II), Plaintiff's post-trial memorandum referred only to § 523(a)(2)(B)(Count II). The Court therefore deems Count I abandoned and will only address Count II in its Findings of Fact and Conclusions of Law. The Court will enter a judgment in favor of Defendant as to Count I.

[2] The Court was provided with no evidence as to the amount of the loan.

Sometime thereafter, between November 2001 and January 2002 Defendant responded to an advertisement in the newspaper looking for individuals with good credit interested in purchasing property for investment. (Tr. at 20, 65). The advertisement was placed by Mark Walters, the owner of Realty Connections. Defendant met with Walters on multiple occasions to look at investment properties which Realty Connections had for sale. (Tr. at 21–22). Realty Connections had for sale property located at 7838 Timberlin Park Boulevard in Jacksonville, Florida (ATimberlin Park@). (Def.'s Ex. 11; Tr. at 67). The asking price of Timberlin Park was $280,000.00. (Tr. at 21).

Defendant decided to purchase Timberlin Park. Defendant told Walters that she had provided Parker with all of her income information and had already been approved for a loan with Monarch Mortgage. (Tr. at 65). Defendant did not complete another loan application and did not provide Walters with any income information or documentation. (Tr. at 65–66).

Plaintiff is a mortgage lender based in California. (Tr. at 26). Pursuant to an arrangement between Plaintiff and Monarch Mortgage, Monarch Mortgage submits loan applications for approval and funding through Plaintiff. (Tr. at 27–28). Upon receipt of a request by Monarch Mortgage, Plaintiff sets up a file, insures that all necessary documentation is supplied and forwards the file to its underwriting department. If a loan is approved by the underwriting department, Plaintiff notifies Monarch, the borrower's agent. Monarch then notifies the borrower. Thereafter, the loan documentation is prepared, a closing is set and the loan is funded. (Tr. at 30–31, 47–49). In most cases, Plaintiff does not keep the loans but rather sells them in the secondary market. Plaintiff may or may not continue to service the loans after the sale. (Tr. at 36).

Walters submitted a loan application to Monarch Mortgage on behalf of Defendant. Monarch Mortgage then submitted a loan application to Plaintiff on behalf of Defendant under Plaintiff's stated income loan program.[3] Plaintiff approved stated income loans for a combined amount of $280,000.00, the appraised value of Timberlin Park. (Tr. at 10, 28; Pl.'s Ex. 11). Under the stated income loan program, Defendant was not required to provide any back-up or supporting documentation relating to her income, assets or liabilities. (Tr. at 29–30). According to Plaintiff, approval of the loan was based on: (i) a loan application submitted to Monarch Mortgage by Walters on behalf of Defendant; (ii) a verbal verification of Defendant's employment; (iii) a verbal verification of the fact that Defendant was leasing an apartment; (iv) an appraisal of Timberlin Park; and (v) Defendant's credit report and corresponding credit score. (Tr. at 43–45).

Defendant testified she was not aware her application was submitted under Plaintiff's stated income program and that she assumed Walters obtained from Monarch Mortgage the income information she had provided to Parker. (Tr. at 76–77, 19). Defendant also testified that although she questioned how a person earning less than $3,000.00 monthly could afford to make the $2,700.00–$2,800.00 payments on Timberlin Park, Walters "offered to basically take care of everything. Basically all I had to do was go to closing and buy a house, and

---

**3.** Plaintiff's witness testified that she believed the loan application was taken by phone. She also testified that it is typical for a loan application to be taken by mail, telephone or in person and that an application taken by telephone will typically not be signed until closing along with the loan documents.

he would manage it, pay for half of all the expenses." (Tr. at 21, 74).

The closing on Timberlin Park was on February 26, 2002. Defendant was not represented by counsel. During the 15 minute closing, Defendant was presented with two different loan closing packages (one for each of two loans secured by first and second mortgages) and asked to sign and initial many pages of documents. The loan application Defendant signed at closing indicated that: 1) her monthly income was $9,578.22; 2) her bank accounts deposits totaled $9,700.00; 3) her personal property was valued at $35,000.00; and 4) her automobile was valued at $23,000.00. As previously stated, Defendant was an administrative assistant for a commercial construction company earning approximately $2,917.00 per month. Defendant's duties were clerical in nature, and she did not receive commissions or bonuses. (Tr. at 12–13). Additionally, Defendant did not have any equity in her automobile and did not have savings and other assets valued at $45,0000.00. (Tr. at 14–15). Defendant admitted that the figures on the loan application were "not even close" to being accurate. (Tr. at 15).

Defendant testified that she felt rushed but was assured that the documents were standard and not out of the ordinary. (Tr. at 69–70). In addition to signing the loan application, Defendant signed a document titled Occupancy and Financial Status Affidavit (the "Occupancy Affidavit"). The Occupancy Affidavit indicated that Timberlin Park would be Defendant's principal residence. Although she testified that she did not read any of the documents before she signed them, Defendant noticed and questioned the principal residence designation on the Occupancy Affidavit. After she was told "not to worry about it, everything was standard", she signed it anyway. (Tr. at 69).

Kyle Roll, Plaintiff's witness, testified that Defendant would not have qualified for the loan on Timberlin Park even if she had earned $5,000.00 monthly. (Tr. at 34). Roll also testified that even if Defendant had earned $10,000.00 monthly, Plaintiff would not have approved the loan if the loan application had reflected that Defendant did not intend to occupy Timberlin Park as her principal residence.

Walters did not split the costs and expenses associated with Timberlin Park. Defendant's income was not sufficient to cover the mortgage payments on Timberlin Park and her other expenses. Defendant made three or four payments after which the loans went into default. (Tr. at 72, 75). Plaintiff sold the first note and assigned the first mortgage between the time of closing and the default. Thereafter, the purchaser foreclosed on Timberlin Park. Timberlin Park was sold at auction in February, 2003.

In addition to Timberlin Park, Defendant also owned a home in the Country Club of Orange Park (the "Country Club Property"). On January 21, 2003 Wells Fargo Bank Minnesota, N.A., the Country Club Property mortgagee, obtained a foreclosure judgment against Defendant in the amount of $256,196.99. On April 30, 2003 Defendant filed a Chapter 7 bankruptcy petition. Defendant listed the Country Club Property on her schedules as rental property and valued it at $235,000.00. (Def.'s Ex. 7).

### CONCLUSIONS OF LAW

█ While the fundamental goal of the Bankruptcy Code is to provide the honest debtor with a fresh start, such a policy must be tempered by the need to prevent dishonest debtors from using the law as a shield. See *Jones v. J.G. Wentworth S.S.C. Ltd. Partnership (In re Berghman)*, 235 B.R. 683, 692 (Bankr.

M.D.Fla.1999) (citing *Bracco v. Pollitt (In re Pollitt)*, 145 B.R. 353, 355 (Bankr. M.D.Fla.1992)). Accordingly, under the circumstances prescribed in § 523 of the Bankruptcy Code, certain debts will be excepted from a debtor's discharge. See *id.* Exceptions to discharge must be strictly construed in order to give effect to the "fresh start" policy of the Bankruptcy Code. See *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994). In order for a particular debt to be excepted from discharge, a plaintiff must prove by a preponderance of the evidence that a debtor's actions fit within the exception. See *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Plaintiff seeks to have the debt owed it by Defendant excepted from Defendant's discharge under 11 U.S.C. § 523(a)(2)(B). That section provides in pertinent part:

> (a) A discharge under Section 727 ... of this title does not discharge an individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (B) use of a statement in writing—
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property or services or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive;
>
> 11 U.S.C. § 523(a)(2)(B).

■ Under 11 U.S.C. § 523(a)(2)(B), Plaintiff must prove that Defendant provided a written statement: (i) that was materially false; (ii) respecting her financial condition; (iii) on which Plaintiff reasonably relied; and (iv) Defendant caused to be made or published with the intent to

deceive. In re Hunter, 229 B.R. 851 (Bankr.M.D.Fla.1999).

## I. *Material Falsity.*

■ Although mere inaccuracy does not constitute material falsity, a significant understatement of liabilities and exaggeration of assets does. *In re Floyd*, 177 B.R. 985, 990 (Bankr.M.D.Fla.1995). The loan application represented that Defendant earned $9,578.22 per month when she actually earned $2,917.00. Additionally, the loan application significantly overstated the amount of Defendant's bank account deposits and the value of her other personal property. The Court finds that the loan application was materially false.

## II. *Respecting Financial Condition.*

There is no dispute that the loan application respected Defendant's financial condition.

## III. *Made or Published with Intent to Deceive.*

■ Because direct evidence of intent is rarely available, a court may infer an intent to deceive from the totality of the circumstances. *In re Cram*, 178 B.R. 537, 540 (Bankr.M.D.Fla.1995). A false representation on a financial statement made with actual knowledge of its falsity or with reckless indifference and disregard of the actual facts which were readily available is sufficient to establish an intent to deceive. *In re Albanese*, 96 B.R. 376, 380 (Bankr. M.D.Fla.1989).

■ Defendant asserts that she was not aware of the inaccuracies in the loan application until the loan went into default and that she believed Walters used the information she had previously provided to Parker to get approval for the Timberlin Park loan. First, even assuming that she did not read the loan application prior to clos-

ing, Defendant could not possibly believe that an individual earning $2,917.00 per month could obtain financing on a $280,000.00 home with $2,700.00–$2,800.00 monthly payments without misrepresenting her financial status. Second, Defendant's failure to read the loan application constitutes at a minimum a reckless indifference and disregard of the information readily available to her. Third, Defendant's testimony that she believed she was only responsible for half of the expenses and would not have to make any payments is not credible. Finally, Defendant's ownership of another "rental" property valued at $235,000.00 belies an innocence or lack of sophistication. The Court finds that the totality of the circumstances evidences an intent to deceive.

### IV. *Reasonable Reliance.*

 Whether a creditor's reliance is reasonable is a question of fact to be judged in light of the totality of the circumstances. *Coston v. Bank of Malvern (In re Coston),* 991 F.2d 257, 260 (5th Cir.1993). A bankruptcy court may consider, among other things: 1) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; 2) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; 3) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations; 4) the creditor's standard practices in evaluating credit worthiness; and 5) the standards or customs in the creditor's industry in evaluating creditworthiness. *In re Cohn,* 54 F.3d 1108, 1117 (3d Cir.1995) (citing *Coston,* 991 F.2d at 261).

 Initially Defendant argues that Plaintiff did not actually rely on the loan application in approving the loan. Defen-

dant points out that Plaintiff approved, funded and closed the loan without ever seeing a signed loan application. However, Roll testified that she believed the loan application was taken by telephone. She also testified that it is typical for a loan application to be taken by mail, telephone or in person and that an application taken by telephone will typically not be signed until closing along with the loan documents. Although Plaintiff approved the loan without seeing a signed loan application, the loan was not funded and closed until after Defendant signed the loan application. If instead of signing the loan application at closing, Defendant had pointed out the inaccuracies therein, Plaintiff would not have funded the loan. The Court finds that Plaintiff relied on the signed loan application when it funded and closed the loan.

Next, Defendant argues that Plaintiff did not rely on the loan application since, under its stated income program, that information was not verified. Defendant contends that Plaintiff made the loan based on Defendant's credit rating and the appraisal of Timberlin Park. Roll testified that Defendant would not have qualified for the loan even if she made $5,000.00 per month. The Court finds that Plaintiff actually relied on the loan application even though it did not verify the accuracy thereof.

Finally, Defendant argues that to the extent Plaintiff relied on the loan application, such reliance was not reasonable. Defendant contends that a monthly salary of $9,578.22 for a 30 year old administrative assistant with a high school education was a red flag that should have alerted Plaintiff to the possibility that the income figures were questionable. However, as Plaintiff's expert pointed out, Defendant had been in the field for ten years and "the term 'administrative assistant' can cover a

lot of things". Additionally, $3,876.22 of Defendant's purported monthly salary was commissions. The Court does not find that the income information was a red flag. While minimal investigation would have revealed the inaccuracy of Defendant's representations as to her income and assets, the very nature of a stated income loan is the mortgagee's reliance on the income and assets stated on the application. Plaintiff followed its standard practice in evaluating credit worthiness by verifying Defendant's employment and credit rating. The Court finds that given the totality of the circumstances, Plaintiff's reliance was reasonable.

## CONCLUSION

When Defendant submitted a loan application which significantly overstated her income and assets, she submitted a materially false financial statement. Plaintiff reasonably relied on the loan application when it extended credit to Defendant. Defendant submitted the loan application with the intent to deceive Plaintiff. The Court will except Defendant's debt to Plaintiff under 11 U.S.C. § 523(a)(2)(B). The Court will enter a separate judgment consistent with these Findings of Fact and Conclusions of Law.

## JUDGMENT

This proceeding came before the Court upon a complaint seeking to except Defendant's debt to Plaintiff from Defendant's discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A)(Count I) and § 523(a)(2)(B)(Count II). Upon Findings of Fact and Conclusions of Law separately entered, it is

**ORDERED and ADJUDGED:**

1. Judgment is entered in favor of Defendant, Marci DeJulio, and against Plaintiff, Master Financial, Inc. as to Count I. The debt owed to Plaintiff by Defendant is not excepted from Defendant's discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

2. Judgment is entered in favor of Plaintiff, Master Financial, Inc., and against Defendant, Marci DeJulio, as to Count II. The debt Defendant owes to Plaintiff is excepted from Defendant's discharge pursuant to 11 U.S.C. § 523(a)(2)(B).